**64 So.2d 216**

**NALTY et al. v. NALTY.**

No. 40285.

March 23, 1953.

Sydney J. Parlongue, New Orleans, and C. Paul Phelps, Ponchatoula, for Elmo Badon, plaintiff-appellant.

Reid & Reid, Hammond, for Raymond J. Nalty, curator, defendant-appellee.

MOISE, Justice.

Plaintiff, Elmo Badon, proprietor of the Moulin Rouge, a Vieux Carre night club, instituted this action to recover from the assets of the interdict, Louis D. Nalty, through his curators, $8,164.40, plus interest, etc., representing eleven checks—the first in the amount of $425 dated July 6, 1949, and the remaining ten checks totalling $7,739.40, dated respectively, September 4, 5 and 6, 1949—upon which payment was never realized.

The defendant curators denied consideration and averred that at the time the checks were given, the interdict, Louis D. Nalty, had freely indulged in alcoholic drinks, and was notoriously insane, and, that his insanity was evident and should have been apparent to the plaintiff.

The district judge, having concluded that plaintiff Badon, the night club operator, knew the condition of the interdict when he received and cashed his checks, stated, in dismissing plaintiff's suit, that " * * * This plaintiff is not in court in good faith, nor with clean hands or a clean conscience".

Plaintiff's appeal is based on the following alleged errors:

1. That the trial court erred in returning the case to the docket after submission on February 23, 1950, and hearing the testimony of Dr. Jones.

2. That the trial court erred in refusing the plaintiff the right to visit the interdict with a physician of his choice.

3. That the trial court erred in deciding that Louis D. Nalty was suffering mental incapacity of such a nature that it was, or should have been apparent to the plaintiff at the time of the signing of the checks.

Only factual issues are involved.

█ Our jurisprudence is well established that a judgment of the district court based on findings of fact will not be disturbed, unless it is manifestly erroneous. Cormier v. Douet, 219 La. 915, 54 So.2d 177; Eals v. Swan, 221 La. 329, 59 So.2d 409; Moser v. Moser, 220 La. 295, 56 So. 2d 553; and Diez v. Diez, 219 La. 576, 53 So.2d 677.

Before discusssing the alleged errors, it is well to note that Louis D. Nalty was interdicted on November 18, 1949, and confined to DePaul Sanitarium in New Orleans, where he had been a patient since September 13, 1949, for a condition known as cerebellum arteriosclerosis or hardening of the arteries of the brain.

The error first assigned relates to the testimony of Dr. Jones, on his first examination, as follows:

"Q. Dr., in your opinion, could a layman of ordinary intelligence have determined Mr. Nalty's mental condition at that time? A. *It would have been practically impossible for a lay-*

*man to determine the condition that* persisted under the surface. * * * " (Italics mine.)

This answer shows conclusively that an expert is testifying to a medical fact,—that a layman would be unable to determine the *form* of Mr. Nalty's insanity, because it was a condition that persisted under the surface. The atrophication of the brain arteries could only be determined by a careful examination by one skilled in this particular field and with the use of proper modern equipment. However, in this instance, we are not concerned with a particular form of insanity, but, we are speaking of a layman's ability to recognize an incapacity which was apparent at the time of the signing of the checks by the interdict. The interest of justice, therefore, required that Dr. Jones should explain any ambiguity in his testimony.

Plaintiff cites Article No. 484 of the Code of Practice, in support of his argument that the case should not have been reopened. This article provides:

"After all incidental questions shall have been decided, and both parties have produced their respective evidence, the argument commences; no witness then can be heard, nor proof introduced except with the consent of all the parties."

█ The decisions of our court have been written into this article, and now the reopening of a case is left to the discretion

of the trial judge. Riddell v. Rice, 128 La. 241, 54 So. 785; Rea v. Dow Motor Co., La.App., 36 So.2d 750.

In the instant case, we cannot say that the trial judge abused his discretion in reopening the case for the purpose of permitting Dr. Jones to give additional testimony. His original testimony was not clearly understood by either counsel for the plaintiff or defendants. Additionally, there was no argument presented in this case. It was to be submitted on briefs at the time permission was given for the reopening.

The basis of plaintiff's second complaint is that the court erred in refusing his request to visit the interdict at DePaul Sanitarium with a physician of his choice.

The record does not disclose that the request was made in writing, nor is its purpose indicated, or is it shown that the verbal motion had been transcribed. Under these circumstances, we feel that the trial judge did not abuse his discretion.

The third assignment of error is one which goes to the merits of the case, and, before discussing it, the facts of record will be reviewed briefly:

All of his life, Louis D. Nalty, a bachelor, lived with his mother in Hammond, La. He was sixty-three years of age at the time of the incidents involved herein. He was a reputable, conservative business man and had amassed a large fortune, consisting of lucrative interest bearing assets. After his mother's death in April, 1947, he began visiting the night clubs on the downtown side of Canal Street in New Orleans. During 1948 he became closely acquainted with a Mr. Lawrence Gentile and his wife. Gentile, who owned and operated the Coconut Grove night club, testified that Nalty came often to his place and that he cashed checks for him. These checks, Gentile says, ranged in amounts from $75 to $400. He said, Nalty would cash a check, buy a drink, and pocket the remaining cash—sometimes as much as $300. Gentile stated that he would not dispute having cashed as much as $23,937.50 in checks for Nalty. Through the Gentiles, Nalty met Elmo Badon, owner of the Moulin Rouge. Nalty's brothers had become aware of the changed mental condition of their brother and endeavored to break up his visitations in the night club district.

The first check involved in this suit was given by Nalty to Badon on July 6, 1949. Physical facts plainly show Nalty's condition at that time. The check is not signed and the handwriting thereon is not legible. Badon cashed this check and held it. Three days later, July 9, 1949, Nalty was arrested, at the instance of his brothers, and placed in the New Orleans Mental Hospital, and on the following morning was confined in DePaul's Sanitarium. The record is silent as to the nature of his release from DePaul's on August 1, 1949, but it does indicate that this release was without the advice or orders of the house physician of that institution. Thereafter,

continuously from September 4, 1949 through September 6, 1949, Nalty was on one stupendous escapade at the Moulin Rouge. During this time, he allegedly entertained all of its patrons, as well as the night-tour visitors. He provided drinks and eats for all. The club's slips on the night of September 4, 1949, alone, charge Nalty with almost 800 highballs and more than 100 quart bottles of champagne. Ten checks approximating $7,739.60 were taken from Nalty, out of which he is alleged to have received about $1,000 cash. This fantastic spree climaxed his wild spending. His bank account was completely exhausted. For reasons best known to Mr. Badon, he held Nalty's checks and did not present them in the usual course of business to the bank for payment, nor did he deposit them to his credit or that of Moulin Rouge, if such accounts existed. However, when the checks were finally presented for payment they were not honored. On September 13, 1949, Nalty was found by his brothers, who had searched for him, at a camp in Slidell, doped and in a stupor. The record is silent on another point—how Nalty reached the camp and who was responsible for his concealment. His brothers had become alarmed over his actions and had been informed by a street-walker in the night club district that "Mr. Louis" had been taken away, and the place might be Slidell. He was brought back to New Orleans by his brothers, placed in the DePaul Sanitarium again, and interdicted on November 18, 1949.

The learned trial judge, in his reasons for judgment, had this to say:

" * * * The Court is convinced that the plaintiff knew the weakened mental condition of Mr. Nalty, and further that the plaintiff committed acts tending to aggravate and further such conditions in order to defraud him of his cash.

"*There must have been some motive for having taken the defendant to a camp in Slidell, keeping him concealed from his family and friends and keeping him in a doped or drunken condition.*

"*The plaintiff knew he was mentally incompetent and furthered this condition in order to squander his money to the plaintiff's advantage. Knowing his condition, they accepted his money in bad faith.*"

Under Article No. 402 of the LSA–Civil Code, the following question is posed:

"Could the party who contracted with the interdict have been deceived as to his mental condition?"

The trial judge's answer to this question is in the negative. Dr. Jones declared that after a few minutes conversation with Nalty one could determine that he was insane. Dr. Conerly, Chief of Staff at the DePaul Sanitarium, stated that anyone knowing Nalty prior to the month of September 1949 would have determined that he (the interdict) was mentally unsound. Therefore, the proof of record amplifies the

fact that, as set out in the last paragraph of Article No. 402 of the LSA–Civil Code,

"*Notoriously, in this article, means that the cause of interdiction was generally known by the persons who saw and conversed with the party.*" (Italics mine.)

In this instance, the persons who saw and conversed with Nalty were the plaintiff himself, Badon, and those connected with his establishment.

Badon and all of the witnesses presented for the plaintiff testified that neither Nalty nor any member of alleged parties was drunk. It is unbelievable that so many, many highballs could be consumed and such large quantities of champagne drunk without those partaking becoming inebriated or intoxicated. Statements of similarity are suspicious and are usually incredible. The rule of evidence as to believable testimony is: when witnesses who are called to the stand vary their testimony by circumstantial variety which is coupled with substantial unity, theirs is the strongest sort of evidence.

In the case of Baumgarden, Curatrix, v. Justin J. Langles, 35 La.Ann. 441, the court would not permit the annullment of a sale but stated:

"We fully recognize the fact, however that a person may be mentally and physically weakened by disease, without being legally incapacitated to contract, and the law extends its shelter-

ing arms over such persons to the extent of scrutinizing contracts made by them and protecting them from imposition, undue influence, improper advantage and other fraudulent conduct by persons dealing with them."

The late Chief Justice O'Niell stated in the case of Twomey v. Papalia, 142 La. 622, 77 So. 479, 481:

"A contract cannot be annulled on the ground that one of the contracting parties was insane, if the contract was made prior to the filing of a suit to interdict him, except on the allegation and proof either that he was notoriously insane or that the other party to the contract could not have been deceived as to the state of mind of the insane party."

The defendant has unequivocally proved that Nalty was notoriously insane, having alleged such fact, and having fully borne the burden of proving that the plaintiff could not have been deceived by Nalty's actions.

Our conclusion is that on and since July 6, 1949, Louis D. Nalty, the interdict, in the clutches of those who encouraged him to squander his money—(a fortune of more than $150,000—in only a short period of time in night club life in New Orleans), presented a predicament of helplessness as did the traditional "Tom Cat of Tartarus" who had neither teeth nor toe nails.

The defense of lack of consideration need not be discussed, for the reasons set out above.

The judgment of the trial court dismissing plaintiff's suit is affirmed. Plaintiff to pay all costs.